In re BISCAYNE INVESTMENT
GROUP, LTD., Debtor.

No. 99–16762–BKC–AJC.

United States Bankruptcy Court,
S.D. Florida.

May 29, 2001.

Patricia R. Young, Perrone & Young, John A. Barney, Shelley I. Stiles & Associates, Brentwood, TN, for Movant.

Scott Alan Orth, North Miami Beach, FL, for Respondent.

### *MEMORANDUM OPINION*

JOHN H. SQUIRES, Bankruptcy Judge.

This matter comes before the Court on the objection of Sabine Heigrodt ("Heigrodt"), brought pursuant to Federal Rule of Bankruptcy Procedure 3007 and Local Rule 3007–1, to the claims of Biscayne Investment Group, Inc.("BIGI") and Stefan Drexl ("Drexl"), and on the objections of Drexl and BIGI to the claim of Heigrodt. For the reasons set forth herein, the Court allows the claim of Heigrodt in the sum of $1,085,846.72 and overrules the objections of Drexl and BIGI thereto. Further, the Court allows the claims of Drexl and BIGI in the amounts of $582,000 and $359,493.54, respectively, and overrules the objection of Heigrodt. Moreover, the Court holds that the claims filed on behalf of Drexl and BIGI should be equitably subordinated to the claim of Heigrodt pursuant to 11 U.S.C. § 510(c)(1). Finally, the Court denies as moot the emergency motion of Heigrodt for the trustee to assign claims of the estate.

### I. *JURISDICTION AND PROCEDURE*

The Court has jurisdiction to entertain these matters pursuant to 28 U.S.C. § 1334 and Local Rule 87.2 of the United States District Court for the Southern District of Florida. They are core proceedings under 28 U.S.C. § 157(b)(2)(A), (B) and (O).

### II. *FACTS AND BACKGROUND*

In 1994, Heigrodt and Drexl, both from Germany, met through a mutual friend in Naples, Florida. Eventually, the two developed a romantic relationship. Drexl informed Heigrodt of his plans to invest in Miami Beach, Florida real estate. Specifically, Drexl was interested in undertaking a condominium conversion project. Drexl formed Biscayne Investment Group, Ltd. (the "Debtor"), a Florida limited partnership, to develop condominium conversions. BIGI was the general partner of the Debtor and Drexl was its sole shareholder, director and controlling person. It is undisputed that as the sole controlling person and sole owner of BIGI, Drexl ran the Debtor's business and made the decisions for the Debtor.

At trial, Drexl initially stated that he was not a limited partner in the Debtor. This, however, is contrary to his deposition testimony given on January 6, 1999, wherein he stated he was an 87% limited partner in the Debtor, as well as similar statements in his February 19 and March 29, 1999 depositions. Moreover, he identified that he was listed as a limited partner in the Debtor's partnership tax returns for 1995, 1996 and 1997. *See* Exhibit S.

Heigrodt (who has limited English, and testified with the assistance of an interpreter) testified that she told Drexl she wished to invest some of her finances. Drexl discussed with Heigrodt the benefits of her financial participation in a condominium conversion project. On September 12, 1994, Heigrodt and Drexl signed the Limited Partnership Agreement (the "Agreement") in which Heigrodt was listed as a limited partner. *See* Exhibit Y. Drexl requested $200,000 from Heigrodt to assist in the financing of the purchase. *See* Exhibit F. Drexl testified that he could not financially handle the acquisition and closing of two buildings with only $200,000 from Heigrodt because the purchase price of both buildings was approximately $2.8 million. Ultimately, Drexl requested and received $600,000 from Heigrodt. *See* Exhibit G.

An "Addendum to Limited Partnership Agreement" (the "Addendum") was prepared by Drexl. On September 12, 1994, Heigrodt, as a limited partner, signed the Addendum. *See* Exhibit G. The Addendum shows that Heigrodt would recover not only 10% interest on the $600,000 loan she made to the partnership, but also a 12% profit participation that she would receive as her investment. The sum was to be paid back within two years, or earlier, if all the condominium units were sold in the Debtor's two buildings. Drexl admitted that the Addendum did not specify that the $600,000 paid by Heigrodt was a capital contribution. One of the disputes at bar concerns whether this $600,000 should be classified as Heigrodt's equity interest and capital contribution as a limited partner in the Debtor, or whether it is purely a debt obligation owed her. Because of the limited remaining funds on hand with which to pay allowed claims, this is a significant issue.

Heigrodt loaned the Debtor additional funds in the amounts of $139,000 and $25,000 in 1995. *See* Exhibits H and I. Pursuant to the Loan Agreement for $139,000, the Debtor promised to repay that loan at 12.5% interest. *See* Exhibit H. Pursuant to the Loan Agreement for $25,000, the Debtor promised to repay that loan at 15% interest. *See* Exhibit I. Drexl and BIGI do not dispute the validity of these loans. Heigrodt admitted that she received partial repayment of approximately $48,000 in 1995, which was originally designated a repayment of interest. The parties mutually agreed, however, to treat it as a principal payment, so Heigrodt would not have to pay additional income taxes in Germany.

According to Heigrodt, after Drexl obtained the $600,000, he began treating her badly. Heigrodt returned to Germany while Drexl managed the project. There-

after, their romantic relationship ended and their business relationship deteriorated as well. Although Drexl obtained sales contracts for the condominium units, the actual closings on the units were few. The project ultimately failed, which led to the Debtor's bankruptcy filing.

When Heigrodt began to encounter problems with Drexl in her attempts to recover the monies owed to her, she contacted a friend, Peter Thyssen, who assisted and advised her on the project. Thyssen, at her direction, contacted Miles Klein, the Debtor's certified public accountant, and negotiated with Klein for her benefit. Thyssen sent a letter which in part provided that of the funds Heigrodt gave to the Debtor and Drexl, $600,000 was referred to as capital investment and the balance was a loan in two installments: $139,000 and $25,000. Thyssen demanded an accounting of the use of those funds from Drexl. *See* Exhibit N.

Not having received repayment per the terms of the Addendum, in 1998, Heigrodt instituted litigation against Drexl, BIGI and the Debtor in the state court in Dade County, Florida. In 1999, the suit was amended to include claims against Drexl, as the controlling manager of the Debtor, alleging malfeasance and gross negligence. The state court appointed a receiver on April 1, 1999, prior to the filing of the Debtor's bankruptcy petition. *See* Exhibit K.

Drexl filed a proof of claim in the instant case in the amount of $582,000, which he asserts was due for loans made to the Debtor in the sum of $640,882.37, plus 10% interest, less aggregate repayments of $249,996.56. BIGI filed a proof of claim in the amount of $359,493.54, for commissions, expenses and management fees pursuant to the Agreement. Drexl admitted that the provisions of the Agreement state that all loans to the partnership by a part-

ner were required to be evidenced by a written promissory note. *See* Exhibit Y at ¶ 3.03(b). Although he testified he has three signed promissory notes from the Debtor, Drexl did not have the notes with him at the trial, nor were any such notes furnished in discovery. He attached an unsigned promissory note to his proof of claim.

Drexl claims he has located the signed promissory notes from the Debtor and has moved to reopen the proofs to have them admitted. Heigrodt opposes the motion for lack of foundation and her inability to cross examine Drexl as to the authenticity of the documents. The Court grants Drexl's motion to reopen the evidence for inclusion of the executed notes. Drexl's unrebutted testimony was that he had signed the notes at or about the time of their execution and had copies of those signed notes, but was unable to locate them at the time of trial. Accordingly, based on Drexl's testimony, the Court grants the motion over the objection of Heigrodt.

Drexl acknowledged that the general partner of the partnership has the duty to keep the books and records pursuant to the Agreement, and to file tax returns. Drexl admitted that tax returns were not prepared until September or October 1997 and not timely filed with the Internal Revenue Service until early 1998. Drexl further admitted that there were no regular limited partnership records kept in 1995 and 1996, and records were only prepared beginning in 1997. He admitted collecting tenants' security deposits which he did not keep in segregated accounts. Rather, he placed the security deposits in the general account of the Debtor and spent those funds. He further admitted commingling partnership funds with his own. Drexl claims that he advanced personally to the Debtor a total sum of over $600,000.

According to Drexl, beginning in 1996, the partnership was never able to pay him the $8,000.00 a month salary. Although he never received his salary from the partnership, rather than going bankrupt, he lent additional money to the Debtor, and the loans he supposedly made were treated as partnership debts. Drexl admitted he started paying his personal expenses from the Debtor's bank account when the partnership began to run out of operating funds, and it fell behind on paying his salary. Accordingly, when pressed for cash, he used the Debtor's account to pay his personal expenses, and he credited his personal loans against the partnership obligations to him. He further admitted the Debtor's account was used to make some personal loan payments on his Mercedes, and pay some of his personal credit card and other expenses, which he contends were in lieu of the unpaid salary.

On July 9, 1999, the Debtor filed a Chapter 11 petition. *See* Exhibit R. Subject to the disposition of the contested claims at bar, on February 1, 2001, the Court entered an order dismissing the case after all other claim objections have been resolved. The Court found that all other third party creditors' claims would be paid in full or have been settled, with substantial funds remaining on hand for the equity security holders' claims. Thus, the Court found that no plan and disclosure statement need be filed.

### III. *APPLICABLE STANDARDS*

 Pursuant to Federal Rule of Bankruptcy Procedure 3001(f), "[a] proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." Fed.R.Bankr.P. 3001(f); *see also* 11 U.S.C. §§ 501 and 502(a). Claim objectors carry the initial burden to produce some evidence to overcome this re-

buttable presumption. *In re O'Malley,* 252 B.R. 451, 456 (Bankr.N.D.Ill.1999). Once the objector has produced some basis for calling into question allowability of a claim, the burden then shifts back to the claimant to produce evidence to meet the objection and establish that the claim is in fact allowable. *Id.* (citation omitted). However, the ultimate burden of persuasion always remains with the claimant to prove entitlement to the claim. *In re Farley, Inc.,* 237 B.R. 702, 708 (Bankr.N.D.Ill. 1999); *In re Octagon Roofing,* 156 B.R. 214, 218 (Bankr.N.D.Ill.1993). The properly filed claims of Heigrodt, Drexl and BIGI constitute prima facie evidence of the validity and amount of the claims. The objectors to those claims have the burden of presenting evidence to rebut the prima facie validity. If that burden is satisfied, then the claimants bear the ultimate burden of proving their claims.

After considering all of the evidence, the Court concludes that the respective parties have sufficiently proven their claims, which are allowed over the objections thereto. No further discussion is merited in light of the testimonial and documentary evidence admitted at trial. Because there is not enough money on hand to pay the claims at bar in full, the real focus of this dispute is on the two remaining ultimate issues discussed below.

## IV. *DISCUSSION*

The two main issues before the Court are (1) what portion of the contributions by Heigrodt constitute "debt" or "equity" and (2) whether the claims of Drexl and BIGI should be equitably subordinated to Heigrodt's claim pursuant to 11 U.S.C. § 510(c)(1).

### A. *Heigrodt's Claim*

Drexl and BIGI object to Heigrodt's claim on the basis that under the Agreement, Florida law and the Bankruptcy Code, her claim is not entitled to equal priority with those of general unsecured creditors. Further, they allege that the efforts of Heigrodt by reason of her application to the state court for the appointment of a receiver for the Debtor caused a significant loss of the Debtor's assets. The Court summarily rejects this point in light of Drexl's and BIGI's defalcations and breach of their fiduciary duties discussed below.

■■ In the general scheme of liquidations, claims for "debt" are to be paid prior to those of "equity." That principle applies here. In order to resolve the first issue of whether Heigrodt's contributions are "debt" or "equity," the Court must consider the following factors: (1) names given to the certificates evidencing the indebtedness; (2) presence or absence of a fixed maturity date; (3) source of payments; (4) right to enforce payment of principal and interest; (5) participation in management flowing as a result of the advances; (6) status of the contribution in relation to regular corporate creditors; (7) intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) source of interest payments; (11) ability of the corporation to obtain loans from outside lending institutions; (12) extent to which the advance was used to acquire capital assets; and (13) failure of the debtor to repay on the due date or to seek a postponement. *See, e.g., Stinnett's Pontiac Service, Inc. v. Commissioner of Internal Revenue Service,* 730 F.2d 634, 638 (11th Cir.1984); *In re Blevins Concession Supply Co.,* 213 B.R. 185, 187–88 (Bankr. M.D.Fla.1997) (and cases cited therein). " 'The approach of this court has been to consider all the factors and weigh the evidence favoring characterization of the advance as debt or equity, while realizing

that the various factors are not of equal significance and that no one factor is controlling.'" *Stinnett's Pontiac,* 730 F.2d at 638 (*quoting In re Estate of Mixon v. United States,* 464 F.2d 394, 402 (5th Cir. 1972)).

The proof of claim filed on behalf of Heigrodt makes demand for a total of $1,085,846.72, which includes interest through the date of filing of the claim. Because it is not disputed that Heigrodt has produced valid promissory notes for undisputed loans constituting debt in the amounts of $139,000 and $25,000 (Exhibits H and I), and that she has received approximately $48,000 in partial repayment for that debt, the Court need not further address the validity and nature of those loans. There is no dispute that the remaining balance on these loans is a valid, unsecured claim for "debt," for which Heigrodt is entitled to be compensated. However, because there remains a question as to the nature of her $600,000 contribution, the Court will now determine whether such contribution constitutes "debt" or "equity" in the nature of a capital contribution under the Agreement.

The Court will now review the debt-equity question, in view of the facts of the instant case and in light of the above referenced factors which are relevant and significant.

(1) Name given to the certificate: In contrast with the notes for the loans of $139,000 and $25,000, which are entitled "Loan Agreement[s]," the Addendum makes no specific reference to any particular type of contribution arrangement. *See* Exhibits H, I and G. To the contrary, on its face, the Addendum is vague in its intent and merely memorializes that Heigrodt contributed the amount of $600,000 to a project. Neither the identity of the "partnership" nor the identity of what "Limited Partnership Agreement" the Ad-

dendum is an appendage to is made known.

(2) Presence or absence of a fixed maturity date: The Addendum states that repayment will be made "after the project is sold out or after 2 years whatever will be earlier." *See* Exhibit G. The Court finds that this statement evidences an uncertain maturity date. Similarly, the other two notes contain unspecified maturity dates as well. *See* Exhibits H and I. It is important to note, however, that the presence of the option of repayment pursuant to the Addendum whereby payment would occur when the project was be sold out could be construed to mean that repayment was tied to the "fortunes of the business," which would indicate that the repayment terms are indicative of a capital contribution, not a loan. *See Blevins,* 213 B.R. at 188 (*citing In re Lane,* 742 F.2d 1311, 1315–16 (11th Cir.1984)).

(3) Source of payments: The payments at issue made to the Debtor were withdrawn from Heigrodt's personal finances and repayments were expected from the Debtor. It is unclear from the text of the Addendum whether Drexl was to be personally liable for repayment of the $600,000. Heigrodt signed as a limited partner, but Drexl did not sign on behalf of the Debtor or BIGI.

(4) Right to enforce payment of principal and interest: There is no question that Heigrodt attempted to enforce payment of the principal and interest. It is undisputed that she instituted legal proceedings against Drexl, BIGI and the Debtor. *See* Exhibit K.

(5) Participation in management flowing as a result of the advances: Heigrodt had no role in the management of the Debtor, which was left solely in the hands of Drexl. The Agreement states that limited partners shall not have the obligation or right

to participate in management of the partnership, and further provides that limited partners have no voice in the business affairs or operations of the partnership. *See* Exhibit Y at § 5.02(c).

(6) Status of contribution in relation to regular corporate creditors: Drexl testified that the Debtor repaid other loans, including some of the loans from Drexl, while in default of Heigrodt's loans.

(7) Intent of the parties: It is clear from the testimony of Heigrodt that she intended that her $600,000 contribution be treated as a loan, contrary to Drexl's view that it was "equity" as her capital contribution for her limited partnership interest under the Agreement. *See* Exhibit K. Heigrodt testified that she was interested in investing in United States real estate and sought security for such investment. Heigrodt indicated that she requested a mortgage, but that Drexl convinced her that such an interest would require that she be present for each individual unit closing-a proposition which would be unrealistic because she lived in Germany. Heigrodt testified that she consented to the Agreement as set forth in the Addendum, believing that it would provide a guarantee of her investment, providing for 10% interest accrual, to be payable within a two-year period. While Heigrodt's 12% profit participation would seem to indicate that her contribution could be construed as a capital contribution or "equity," it remains clear that Heigrodt intended to recover the 10% interest on her investment and that her primary concern was to seek security for her $600,000 contribution. Heigrodt's testimony does not indicate that she primarily sought compensation as a share in profits or as an increased equity interest. *Compare Lane,* 742 F.2d at 1316–18 (testimony showed that Lane was not disinterested creditor lending money to corporation with intent to create debt relationship, but instead made contribution to capital, seeking repayment only if the corporation was successful).

(8) "Thin" or inadequate capitalization: The Debtor probably was inadequately capitalized from the beginning because the financial difficulties surfaced before the condominium conversion process completed. Apparently, the Debtor rarely was in a cash position to pay the monthly salary to the general partner and its principal, Drexl.

(9) Identity of interest between creditor and stockholder: Pursuant to the Agreement, Heigrodt was intended to be a limited partner as well as a creditor.

(10) Source of interest payments: The Debtor was the source of the interest payments. Heigrodt did receive some interest repayment in 1994 and 1995.

(11) Ability of the Debtor to obtain loans from outside lending institutions: There was no evidence in the record regarding this factor other than Drexl, on behalf of the Debtor, obtained additional commercial financing to close the acquisition of the two buildings.

(12) Extent to which the advance was used to acquire capital assets: Heigrodt's $600,000 contribution was utilized in the acquisition of the two buildings.

(13) Failure of the debtor to repay on the due date or to seek a postponement: It is undisputed that the Debtor failed to repay Heigrodt her contribution as agreed in the Addendum.

Thus, under some of the above factors, Heigrodt's initial contribution could be classified as a capital contribution and hence "equity" and under others as a loan or "debt." Regardless of how the $600,000 contribution is classified, the Court overrules the objections of Drexl and BIGI to Heigrodt's claim. The Court allows her claim in the full amount of $1,085,846.72.

The Court rejects Drexl's and BIGI's argument that the doctrines of res judicata and collateral estoppel prevent this Court from giving the state court order appointing a receiver (Exhibit K) any weight or effect.

 Under the doctrine of collateral estoppel, a party is precluded from litigating an issue if (1) the identical issue has been (2) actually litigated in a prior suit which (3) could not have been decided without resolving the issue. *Balbirer v. Austin,* 790 F.2d 1524, 1526–27 (11th Cir. 1986); *In re Held,* 734 F.2d 628, 629 (11th Cir.1984); *Raiford, II v. Abney,* 695 F.2d 521, 523 (11th Cir.1983). The party seeking to invoke collateral estoppel bears the burden of proving that the necessary elements have been satisfied. *In re McWhorter,* 887 F.2d 1564, 1566 (11th Cir. 1989). As the Supreme Court of the United States has stated: "[u]nder collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979) (citations omitted).

 Pursuant to the doctrine of res judicata, a party must prove four elements: (1) the prior decision was rendered by a court of competent jurisdiction; (2) there was a final judgment on the merits; (3) the parties were identical in both suits; and (4) the prior and present causes of action are the same. *Jang v. United Technologies Corp.,* 206 F.3d 1147, 1149 (11th Cir. 2000); *Israel Discount Bank, Ltd. v. Entin,* 951 F.2d 311, 314 (11th Cir.1992).

 Neither doctrine applies to the state court order appointing the receiver because the issues before that court and this Court are not identical. The matters before this Court are claim objections and whether Drexl's and BIGI's claims should be equitably subordinated to Heigrodt's claim. The matter before the state court was the determination of whether a receiver should be appointed for the Debtor. Thus, the issues are not identical and these doctrines may not be properly invoked.

## B. Whether Drexl's and BIGI's Claims Should Be Equitably Subordinated

Heigrodt objects to Drexl's claim on the basis that he allegedly did not loan the Debtor the funds referenced in his proof of claim. The weight of the evidence is to the contrary. Further, she contends that the claims of Drexl and BIGI should be disallowed because as principal of the Debtor's corporate general partner, Drexl converted funds from the Debtor and used the assets of the Debtor for his own benefit in an amount equal to or in excess of the amount of his claim. While this point properly bears on the equitable subordination relief requested, it begs the question of whether the Debtor owed both Drexl and BIGI for unpaid obligations due them, which it did. Thus, the Court finds their claims should be allowed.

Pursuant to § 510(c)(1), the Court may equitably subordinate the claims of Drexl and BIGI for their conduct as insiders violating their fiduciary obligations owed to the partnership, the Debtor and Heigrodt as the other limited partner who was not in control at any time. Section § 510(c)(1) provides in relevant part:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed

interest to all or part of another allowed interest....

11 U.S.C. § 510(c)(1).

 Equitable "subordination relates to the order in which claims have been allowed or are to be paid when the Trustee is paying dividends but does not relate to the validity of the technical legality of a claim." *Ford v. Feldman (In re Florida Bay Trading Co.)*, 177 B.R. 374, 383 (Bankr.M.D.Fla.1994) (citation omitted). Proper exercise of this equitable subordination power can take place only if three elements are established: (1) the claimants must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimants; and (3) subordination of the claims must not be inconsistent with the provisions of the Bankruptcy Code. *In re Lemco Gypsum, Inc.*, 911 F.2d 1553, 1556 (11th Cir.1990); *In re N & D Properties, Inc.*, 799 F.2d 726, 731 (11th Cir.1986); *Tavormina v. Capital Factors, Inc. (In re Jarax Int'l, Inc.)*, 164 B.R. 180, 187 (Bankr.S.D.Fla.1993). The inequitable conduct need not be related to the acquisition or assertion of the claim. *Lemco*, 911 F.2d at 1556 (citation omitted). "The claim can be subordinated only to the extent necessary to offset the harm suffered by the bankrupt and its creditors on account of that conduct." *Id.* (citation omitted).

 While it is not crystal clear whether Heigrodt's $600,000 contribution should be classified as either "debt" or "equity," it is crystal clear that because of Drexl's conduct and breach of his fiduciary obligations as the controlling person of the Debtor and its sole general partner, his individual claim and the claim of BIGI as general partner of the Debtor should be equitably subordinated to Heigrodt's claim.

The evidence clearly demonstrated that Drexl, while acting as principal of BIGI, admittedly utilized funds from the Debtor's bank account to pay his personal expenses, including expenses for a Mercedes automobile and payments on his credit card. Drexl further admitted commingling personal and partnership funds. He admitted to paying his personal expenses from the Debtor's bank account when the partnership began to run out of operating funds and it fell behind on paying his salary. Also, Drexl admitted to crediting his personal loans against the partnership obligations to him. Additionally, he collected tenants' security deposits, which he did not keep in a segregated account. Rather, he placed those deposits in the general account of the Debtor and spent some of those funds for himself personally. Moreover, the state court found that Drexl had mismanaged the Debtor and thus appointed a receiver. *See* Exhibit K.

Alex Fernandez, a certified public accountant and a certified fraud examiner, testified that Drexl violated the requirements of the Agreement by not keeping accurate or complete books and records. According to Fernandez, the Debtor's books and records revealed over $800,000 of unexplained inter-company transactions. Based on his review, Fernandez opined that Drexl's allegation that he made advances to the Debtor in 1995 and 1996 is unsubstantiated by supporting documents to corroborate how the money allegedly paid by the partnership for his personal expenses actually benefitted the Debtor. Fernandez further testified that during the period between 1995–1998, Drexl withdrew $233,000 in cash from the Debtor, plus paid over $900,000 in unsupported expenses that were claimed necessary and reasonable for the partnership. According to Fernandez, these expenditures far exceeded the $8,000.00 monthly salary due the general partner under the Agreement.

None of the Debtor's tax returns and ledgers reflect these figures. Fernandez further stated that there was commingling of Drexl's personal funds with the Debtor's funds. According to Fernandez, the $800,000 of inter-company transfers, plus $105,000 in ˙ unsupported personal expenses, were not properly supported by underlying documents from third parties.

The Court finds that these actions on the part of Drexl constitute a breach of his fiduciary obligations as the controlling person of the Debtor and of its general partner, BIGI. Simply stated, Drexl and BIGI mismanaged the Debtor, violated the Agreement and committed self-serving acts while acting on behalf of the Debtor. Their conduct warrants the proper exercise of the Court's power to equitably subordinate their claims to Heigrodt's allowed claim. Drexl and BIGI engaged in inequitable conduct which resulted in injury to the creditors of the Debtor's estate, especially Heigrodt because she did not receive the agreed repayment of any of her contributions, save the $48,000 discussed above. Additionally, their insider status and effective control from which they perpetrated their misconduct conferred an unfair advantage on them because they received monies that they were not entitled to receive to the detriment of Heigrodt. It is undisputed that Drexl repaid some of his "loans" from the Debtor's assets while in control of the Debtor. Finally, the Court finds that subordination of the claims is not inconsistent with the Bankruptcy Code. Accordingly, the Court hereby equitably subordinates the claims of Drexl and BIGI to the claim of Heigrodt.

## C. *Heigrodt's Emergency Motion for the Trustee to Assign Claims of the Estate*

■ Prior to the trial, Heigrodt filed an emergency motion requesting that the Chapter 11 trustee assign claims of the estate to the remaining partners of the Debtor. Heigrodt contends that she has an action pending in the state court against Drexl and BIGI for breach of fiduciary duties and other acts damaging the Debtor. She maintains that a cause of action against Drexl and BIGI may belong to the Chapter 11 trustee. Heigrodt argues that the trustee would have no interest in prosecuting those claims against Drexl and BIGI because the only parties to benefit from such legal action are the remaining partners. Thus, Heigrodt requests that the Court permit or require the Chapter 11 trustee to assign any such claims for damage to the Debtor's assets to the remaining partners to pursue if they so choose.

In light of the Court's dismissal of the case and the disposition of the claims at bar, the Court denies this motion as moot. The trustee assigned to this case has not seen fit to pursue any actions on behalf of the bankruptcy estate against Drexl and BIGI. If Heigrodt wishes to pursue her claims against either Drexl or BIGI in the state court, she is free to do so at her option inasmuch as the automatic stay of 11 U.S.C. § 362(a) did not operate to bar any such claims against them during the pendency of the case as neither was or is a debtor before the bankruptcy court; the stay has terminated as a result of the dismissal as a matter of law pursuant to 11 U.S.C. § 362(c)(2)(B); and no discharge injunction exists pursuant to 11 U.S.C. §§ 524, 727(a)(1) or 1141.

## V. *CONCLUSION*

For the foregoing reasons, the Court allows the claim of Heigrodt in the sum of $1,085,846.72 and overrules the objections of Drexl and BIGI thereto. In addition, the Court allows the claims of Drexl and BIGI in the sums of $582,000 and

$359,493.54, respectively, and overrules the objection of Heigrodt thereto. Moreover, the Court holds that the claims of Drexl and BIGI should be equitably subordinated to the claim of Heigrodt pursuant to § 510(c)(1). Finally, the Court denies as moot the emergency motion of Heigrodt for the trustee to assign claims of the estate.

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate order shall be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.

## ORDER

For the reasons set forth in a Memorandum Opinion dated the 29th day of May, 2001, the Court allows the claim of Sabine Heigrodt in the sum of $1,085,846.72 and overrules the objections of Stefan Drexl and Biscayne Investment Group, Inc. thereto. Further, the Court allows the claims of Stefan Drexl and Biscayne Investment Group, Inc. in the amounts of $582,000 and $359,493.54, respectively, and overrules the objection of Sabine Heigrodt. Moreover; the Court holds that the claims filed on behalf of Stefan Drexl and Biscayne Investment Group, Inc. should be equitably subordinated to the claim of Sabine Heigrodt pursuant to 11 U.S.C. § 510(c)(1). Finally, the Court denies as moot the emergency motion of Sabine Heigrodt for the trustee to assign claims of the estate.